RODERICK G. Ross, *Plaintiff in Error*, v. HERBERT W. SAVAGE AND THOMAS P. DENHAM, *Defendants in Error.*

Opinion Filed July 1, 1913.

1. All the points adjudicated by an appellate court upon a writ of error or an appeal become the law of the case, and are no longer open for discussion or consideration, but this principle has no applicability to and is not decisive of points presented upon a second writ of error that were not presented upon the former writ of error and consequently were not before the appellate court for adjudication.

2. In construing any written instrument, whether a deed of conveyance, a bill of sale, mortgage, contract or what not, the entire instrument must be considered in order to gather the real intent and to determine the true design of the makers thereof. To that end, all the different provisions of such instrument must be looked to and all construed so as to give effect to each and every of them, if that can reasonably be done. If clauses therein seem to be repugnant to each other, they must be given such an interpretation and construction as to reconcile them if possible, remembering that the intent is the principal thing to be regarded. If one interpretation,

looking to the other provisions of the instrument and its general scope, would lead to an absurd conclusion, such interpretation must be abandoned and one adopted which will be more in accord with reason and probability.

3. When parties deliberately put their engagements in writing in such terms as import a legal obligation, without any uncertainty as to the object or extent of the engagement, it is, as between them, conclusively presumed that the whole engagement and the extent and manner of the undertaking is contained in the writing. No other language is admissible to show what they meant or intended, and for the simple reason that each of them has made that to be found in the instrument the agreed test of his meaning and intention.

4. The first point in construing a contract is to ascertain what was the meaning and understanding of the parties, as shown by the language used, applied to the subject matter.

5. When words or terms having a definite legal meaning and effect are knowingly used in a written instrument, the parties thereto will be presumed to have intended such words or terms to have their proper legal meaning and effect, at least in the absence of any contrary intention appearing in the instrument.

6. There must be a meeting of two minds in one and the same intention in order that there may be a contract.

7. Where a lease contains the following stipulation: "it being expressly understood between the parties hereto that this lease is made for the sole purpose of granting to the lessee the rights and privileges of exploring for mining, taking out and shipping therefrom the merchantable phosphate rock, as well as all other minerals of whatsoever kind or nature as hereinafter provided for, which is or may hereafter be found on, in or under the said land, with the right in the lessee to construct all buildings, and to make all excavations, openings, ditches, and drains and construct all railroads, wagonroads and all other improvements which are or may become necessary or suitable for the purpose of mining or removing

therefrom phosphate or other mineral of whatever nature or kind found thereon and of the carrying on of mining operations thereon," it is obvious that the mutual intention of the parties executing the lease was to give to the lessee the mining rights set forth therein.

8.  When the main purpose of the parties in executing a lease was to give to the lessee the right to mine the phosphate rock upon the lands described therein, even though there is no express covenant on the part of the lessors that there was phosphate rock on the leased premises, in the absence of any showing in the lease to the contrary, it must be held that the parties to the lease assumed that sufficient phosphate rock was in or on the land to enable the lessee to comply with terms of the contract, and that but for this mutual assumption the contract would not have been made.

9.  Where a lease is executed for the purpose of giving to the lessee the right to mine the phosphate rock on the land described therein and the lessee agrees therein to pay "royalty on all phosphate rock mined and shipped from said lands under this lease, while the same shall remain in force at the rate of fifty (50c) for each gross ton," a further covenant therein to the effect that the lessee shall pay advance royalties or ground rent up to a certain named amount, whether sufficient rock is mined or not to yield such amount at the royalty per ton named, is not an independent covenant, but must be held to be dependent upon the covenant to pay royalty upon the phosphate rock mined. In an action upon such contract by the lessors pleas setting up in substance the non-existence of any minable rock in or upon the land constitute a good defense to the action and it is error to sustain a demurrer to the pleas.

Writ of error to Circuit Court of Duval County; R. M. Call, Judge.

Judgment reversed.

*Bisbee & Bedell,* for Plaintiff in error;

*Baker & Baker,* for Defendants in error.

SHACKLEFORD, C. J.—This case comes here for the second time. For the opinion upon the former writ of error see Savage v. Ross, 59 Fla. 407, 52 South. Rep. 16, wherein we reversed the judgment for the reasons stated. Upon the going down of the mandate, divers and sundry proceedings were had, to which it is unnecessary to refer. What is termed the "amended third count to the amended declaration" is as follows:

"3. And the plaintiffs further sue the defendant for that heretofore, to-wit, on the 11th day of June, A. D. 1907, in the County and State aforesaid, the plaintiffs and the defendant made and entered into a contract in writing under seal in the words and figures, following to-wit:

'This Lease made this eleventh day of June, A. D. 1907, between Herbert W. Savage, of the County of Hamilton and State of Ohio, and Thomas P. Denham, of the County of Duval and State of Florida, hereinafter called the lessors, wherein Edith E. Savage, wife of Herbert W. Savage, and Mary S. Denham, wife of Thomas P. Denham, join parties of the first part, and R. G. Ross, of the County of Duval and State of Florida, hereinafter called the lessee, party of the second part.

WITNESSETH, That the lessors in consideration of the sum of One Dollar ($1.00) to them in hand paid by the lessee, the receipt whereof is hereby acknowledged and in further consideration of the covenants, conditions and provisions of this lease to be kept and performed by the lessee do hereby let, remise and release unto the lessee, for a term of ten years from and after the first day of July, A. D. 1907, the right to dig, mine, handle and remove

phosphate rock and all other minerals of whatsoever kind or nature that may be situated upon, in or under the surface of the following described land situate in the County of Clay and State of Florida, to-wit:' "

Then follows a lengthy description of the land, which we omit.

"Together with the right of ingress and egress on, over and upon said hereinabove described premises, and to do all such other and further things on and upon the said lands as the lessors have the privilege and right to do and perform under and by virtue of the rights and interests and privileges reserved to the lessor Herbert W. Savage, in and by that certain deed of conveyance to Long & Buddington dated the 7th day of September, 1905, recorded in Deed Book 'P. P.' page 461 of the Public Records of Clay County, Florida ;and any and all subsequent deed or deeds of conveyance to said Long & Buddington of lands conveyed by the National Bank of the State of Florida to the lessor Herbert W. Savage; and subject nevertheless, to any and all rights of way evidenced by instruments now of record through, over or across any part of said described premises or that may be hereafter granted upon said described lands, it being expressly understood between the parties hereto that this lease is made for the sole purpose of granting to the lessee the rights and privileges of exploring for mining, taking out and shipping therefrom the merchantable phosphate rock, as well as all other minerals of whatsoever kind or nature as hereinafter provided for, which is or may hereafter be found on, in or under the said land, with the right in the lessee to construct all buildings, and to make all excavations, openings, ditches and drains and construct all railroads, wagon-roads and all other improvements which are or may become necessary or suitable for the purpose

of mining or removing therefrom phosphate or other mineral of whatever nature or kind found thereon and of the carrying on of mining operations thereon.

2. The lessee hereby covenants and agrees to pay to the lessors a royalty on all phosphate rock mined and shipped from said lands under this lease, while the same shall remain in force at the rate of fifty (50c) for each gross ton. The royalty shall be due and payable on the 10th days of October, January, April and July in each and every calendar year (which days are hereinafter called 'quarter days'). The payment on each quarter day shall be for the full amount of phosphate rock mined and shipped from said lands during the three months immediately preceding the first day of the month in which the payment shall become due as aforesaid.

The lessee further covenants that during the existence of this lease it will mine and ship, as the agreed minimum output of phosphate rock as follows: From the first day of July, 1907, to the first day of October, 1907, two hundred (200) gross tons, from the first day of October, 1907, to the first day of January, 1908, eighteen hundred (1800) gross tons, from and after the first day of January, 1908, and during the remaniing existence of this lease, a minimum output at the rate of twelve thousand (12,000) gross tons each and every year, or in case in any one or more years the lessee shall not actually ship from said premises the full quantity of said minimum output the lessee will nevertheless pay to the lessors advance royalties to be treated and considered as ground rent, in addition to the royalty paid for the phosphate rock actually shipped during that year, such sum as shall together with the amounts paid as royalties for phosphate rock shipped during said year, amount to Six Thousand Dollars ($6,000.00). It being expressly understood that said ad-

vance royalties or ground rent shall be paid quarterly at the time and in the manner hereinbefore provided for the payment of royalties for phosphate rock actually shipped, and that if in any quarter the lessee shall ship less than one-quarter of the agreed minimum output for that year, and in a subsequent quarter of, or in a later year shall ship more than the agreed minimum output for such subsequent quarter, the lessee in making payment of the royalties on such excess shall be entitled to credit at the rate of fifty cents per gross ton up to the amount of the royalty previously paid on phosphate rock not shipped, and this provision shall apply from quarter to quarter and from year to year until such advance royalty shall be exhausted, and further that the obligation of the lessee to pay advance royalties shall continue in force during the full term of this lease until said lease shall be terminated or surrendered or assigned, in the manner hereinbefore provided, and in case of an assignment of said lease the obligation to mine, or pay for such agreed annual output in ground rent, as well as all other provisions of the lease, shall bind the assignee as fully as the lessee is bound hereby; and that at the time of the making of each payment of royalty the lessee shall transmit to the lessor an exact statement of the amount of phosphate rock shipped from said described land for the period for which the royalty is then to be paid.

3. The phosphate rock shipped from said lands shall be weighed or scaled by the lessee before shipment, and the weights so ascertained by the lessee, shall be taken as the true weights determining the quantity thereof as between the parties hereto, in the absence of any inspector on the part of the lessee, provided, however, that the lessor shall have the privilege of appointing and keeping at their own expense, at the works or mines so operated by lessors,

on said described lands under the terms of this lease, an inspector, who shall for the lessors, check and ascertain the quantity of phosphate rock so mined and removed from said lands, and for the purpose of such inspection, such inspector shall have the right to examine all invoices, statements and books made and kept by the lessee, covering accounts of sale and shipments of phosphate rock so mined and removed. The lessee will furnish the lessors monthly statements showing the weight of phosphate rock so mined, and any errors ascertained in said statements, whether said rock has been inspected by said inspector or not, shall be cognizable and subject to correction by the lessors, and any such difference shall be settled and paid for upon the next regular quarter day. It being expressly understood that the lessors shall have the right, by themselves, or their duly authorized agent or agents, to enter upon said described premises, at any time or times, to inspect or survey the same and to measure the quantity of phosphate rock which shall have been mined thereon or shipped therefrom, provided they shall not unnecessarily or unreasonably hinder or interrupt the operations of the lessee.

4. The lessee covenants to conduct all its mining operations on the said lands in a good workmanlike manner and in accordance with the requirements of good engineering, and so as not to do or cause or permit any unnecessary or unusual permanent waste or injury to the said premises, or inconvenience or hindrance in the subsequent operations of the mines thereon.

5. The lessee further covenants to pay all further taxes and assessments, ordinary or extraordinary, general and specific which may be levied or assessed upon mining rights in the lands hereby leased, and on the phosphate rock mined thereon and on all improvements and per-

sonal property thereon, while this lease shall remain in force, and to furnish the lessors with duplicate tax receipts showing the payment of all such assessments or taxes, provided, however, that the lessee shall always have the right to contest in the courts or otherwise, the validity of any such taxes or assessments, in case he shall deem the same unlawful, unjust, unequal or excessive, or to take such other steps or proceedings as he may deem necessary to secure a cancellation, reduction, readjustment or qualification thereof, before he shall be required to pay and discharge the same or any part thereof, but provided further, that the lessee shall not permit or suffer said lands and property, or any part thereof to be sold at any time for any taxes or assessments, and upon the termination of this lease by surrender or otherwise, as hereinafter provided, the lessee will peaceably surrender possession of the said lands to lessors, free from any and all tax assessments or liens by reason of said mining operations.

The lessee covenants that while this lease shall remain in force and until it is surrendered, or assigned in manner herein provided, he will protect the said lands and the improvements and phosphate rock in stock pile thereon from all mechanics' or laborers' liens or other liens, and keep the title to the same free and clear from all clouds and encumbrances arising from such liens in any way because of its mining operations thereon, or the use and occupation thereof, by the lessee, his agents, servants, employees or contractors.

6. The several payments required to be made hereunder shall be made to the Atlantic National Bank of Jacksonville, a banking corporation doing business in said Jacksonville, Florida, or such other bank as the lessors,. their executors, administrators or assigns may,

from time to time, in writing designate, and the said Atlantic National Bank or other bank, as may be hereafter so designated, shall be deemed the agent, or agents of the lessors respectively for the purpose of receiving, collecting and receipting for such payments.

The payments by this lease required to be made by the lessees shall be made in gold coin of the United States of America of the present standard of weight and fineness.

7.   It is mutually covenanted between the parties, and this lease is granted and accepted upon condition that the lessee shall have the right at any time, upon ninety days' notice, to terminate this agreement and lease by giving written notice in the manner hereinafter provided to the lessors, their heirs, executors, administrators or assigns, who will in such case, acknowledge in writing the receipt of such notice, and this lease shall terminate ninety days after the giving of such notice, whether the same shall be so acknowledged or not.

All arrearages and sums, including taxes that shall be due and payable under this lease, up to the time of this termination, as set forth in said notice, must and will be paid by the lessee within thirty days from such termination and the lessee upon such termination, must and will forthwith execute and record in the office of the Clerk of the Circuit Court in and for Clay County, Florida, a formal relinquishment of such lease.

Said notice of termination of this lease may be given by registered letter, mailed from any postoffice in the United States, postage prepaid and addressed to lessors or their heirs, executors, administrators or assigns, at their respective last known places of residence.

And it is further agreed that the lessee shall have the right to assign this lease or to contract with others to work any mine or mines which are now, or hereafter may

be discovered upon the said lands, or to sub-contract or sub-let the same at his option, with the same rights and privileges as are herein granted to the lessee. It being expressly understood that any such assignment, contract, sub-contract or sub-lease, shall not operate as a release or discharge of the lessee from the performance of the condition of this lease, unless the lessors in writing, shall consent thereto.

8.    This lease is granted and accepted upon condition that if the royalty hereby reserved or the advance royalty of ground rent hereby provided for and agreed to, be paid, or any part thereof, be and remain unpaid, after the days and times above specified, and if the same shall remain in default for a period of sixty days, or in case the lessee shall fail to keep any of the covenants or conditions herein expressed, to be kept and performed by him, and such failure shall continue for sixty days, after the receipt by him of written notice, from the lessors specifying the default, neglect and failure complained of, then and from henceforth, and in either of the said events, but not otherwise, it shall be lawful for the lessors, at their option, to terminate this lease, and to take possession of the said leased premises, which are without any previous process whatever, to re-enter and have and possess the same as fully as if no lease had been given to the lessee and the said lessee and all parties claiming under him shall be wholly excluded therefrom, and this lease shall become and be wholly void, and at an end, subject to the provisions of Article Nine hereof; and the lessors reserve and at all times shall have possession and hold a lien for all unpaid balances due hereunder, and all rock mined upon said premises, and upon all improvements made upon said premises by the lessee.

9.    It is mutually covenanted that upon the termina-

tion of this lease, whether by the acts of the parties or either of them, at the expiration of the term, the lessee shall have sixty days in which to remove all engines, tools, machinery, railway tracks or structures, erected or placed by it upon the said premises, provided that all taxes, royalties and other dues shall have been paid. and all other conditions performed, but the lessee shall not remove or impair any supports placed in the mines upon such premises, nor any timber or frame work necessary to the use of maintaning of the shafts or the approaches to the mines or the tramways within the said mines, and on failure within the said sixty days to so remove such property, all of the same shall belong to and become the property of the lessors. And further that all rights hereunder granted in and to the phosphate rock deposit or any other mineral of whatsoever kind or nature that may be granted or leased hereby shall cease and determine upon the termination of this lease whether by expiration of the term or by forfeiture or by revocation as herein provided.

10. All covenants, conditions and provisions of this lease shall run with the land and shall inure to the benefit of, and be binding upon the heirs, executors, administrators, successors and assigns of the lessors and lessees respectively.

IN WITNESS WHEREOF the parties hereunto set their respective hands and seals in triplicate, the day and year first above written."

We omit the execution and acknowledgments by the parties.

The declaration then proceeds as follows:

"And that under the terms of the said contract or lease, by the election of the defendant, the same was terminated on, to-wit, the 6th day of February, A. D. 1908, by the

defendant having therefore given the requisite ninety (90) days' notice of desire so to terminate the said contract.

And the plaintiffs allege that under and in pursuance of the said contract and lease the defendant immediately entered upon the premises described in the said instrument and forthwith began to dig, mine, handle and remove phosphate rock and other minerals from the said lands; and did up to the termination of the said contract as aforesaid, enjoy the uses of the said premises for the purposes aforesaid; and was at the time of such termination of said contract in the actual possession of the said premises for such purposes under the said contract; and the plaintiffs allege that although they have well and truly kept and performed each and every condition in the said contract contained, entitling them to have and to receive from the defendant a royalty at the rate of fifty cents (50c) per gross ton on two hundred (200) gross tons from the 1st day of July, 1907, to the 1st day of October, 1907, and on eighteen hundred (1800) gross tons from the 1st day of October, 1907, to the 1st day of January, 1908, and on twelve thousand (12,000) gross tons annually from and after the said 1st day of January, 1908, to the termination of the said contract as aforesaid, to-wit, the sum of sixten hundred dollars ($1600.00), yet the defendant has not paid to the plaintiffs the said sum of money nor any part thereof; and the plaintiffs claim three thousand five hundred dollars damages.

BAKER & BAKER,
Attorneys for Plaintiffs.

Bill of Particulars attached.

Jacksonville, Florida, February 6, 1908.

Mr. Roderick G. Ross,

To Herbert W. Savage and Thomas P. Denham, Dr.

To advance royalties as ground rent under that certain contract between the said persons dated June 11, 1907, as follows:

October 1, 1907, 200 gross tons of rock at 50c
  per ton ................................$   100.00
January 1, 1908, 1800 gross tons of rock at 50c
  per ton ..................................   900.00
February 6, 1908, 1200 gross tons of rock at 50c
  per ton ..................................   600.00

                                        $1,600.00"

The defendant filed certain pleas to this count, numbered from 6 to 9 inclusive, which are as follows:

"6    And for a plea to the third count of the plaintiffs' amended declaration defendant says that there was in and upon the land mentioned in the said count no mineral for which defendant covenanted to pay fifty cents per gross ton, as in said count alleged.

7.    And for a further plea to the said third count of plaintiffs' amended declaration defendant says that there was in and upon the land mentioned in the said count no mineral for which defendant covenanted to pay fifty cents per gross ton, as in said count alleged suitable or practicable to be mined.

8.    And for a further plea to the third count of said declaration, defendant says that defendant made or caused to be made due and diligent search for mineral of the character mentioned in said count, and said search failed to reveal any mineral of the character aforesaid.

9.    And for a further plea to the third count of the said declaration, defendant says that defendant made or caused to be made due and diligent search for mineral of the character mentioned in said count, and said search

failed to reveal any mineral suitable or practicable to be mined."

The plaintiffs interposed a demurrer to these pleas, the grounds thereof addressed to the sixth and seventh pleas being as follows:

"1.   That it is immaterial whether or not there was any mineral in and upon said land mentioned in contract declared in and set forth in said pleas. .

2.   That there was no warranty or covenant contained in the lease sued on that there was any 'mineral in and upon' said land.

3.   That there was no warranty or covenant contained in contract sued on that there was any 'mineral in and upon' said land.

4.   That it is immaterial whether or not there was any 'mineral suitable or practicable to be mined in and upon the land mentioned in plaintiffs' declaration.'

5.   That there was no warranty or covenant in lease sued on that there was 'any mineral' suitable and practicable to be mined in and upon land mentioned in plaintiffs' declaration.'

6.   That there was no warranty or covenant in the contract sued on that there was 'any mineral suitable and practicable to be mined in and upon land mentioned in plaintiffs' declaration.'

7.   That the defendant in and by the contract sued on agreed to pay a specific and stipulated sum as an alternate price for use of said land to be called 'ground rent.' whether any phosphate or other mineral should be mined or not, reserving the privilege of terminating said contract upon expiration of ninety (90) days' notice in writing.

8.   That the defendant in and by lease sued on herein agreed to pay a specific rent for said land, whether any

phosphate should be mined or not, reserving the privilege of terminating said lease upon expiration of ninety (90) days' notice in writing."

The following grounds were addressed to the eighth and ninth pleas:

"1.   That it is immaterial whether or not the defendant made due and reasonable effort to find rock on the land mentioned in plaintiffs' declaration.

2.   That it is immaterial whether or not the defendant failed to find rock on said land.

3.   That the failure to find rock or other minerals on said land is not a matter of defense in this action.

4.   That it is immaterial whether or not there was any 'mineral in and upon said land mentioned in plaintiffs' declaration.'

5.   That there was no warranty or covenant contained in lease sued on that there was any 'mineral in and upon' said land.

6.   That there was no warranty or covenant contained in contract sued on that there was any 'mineral in and upon' said land.

7.   That it is immaterial whether or not there was any 'mineral suitable or practicable to be mined in and upon the land mentioned in plaintiffs' declaration.'

8.   That there was no warranty or covenant in lease sued on that there was 'any mineral suitable and practicable to be mined in and upon land mentioned in plaintiffs' declaration.'

9.   That there was no warranty or covenant in the contract sued on that there was 'any mineral suitable and practicable to be mined in and upon land mentioned in plaintiffs' declaration.'

10.   That the defendant in and by the contract sued on agreed to pay a specific and stipulated sum as an

alternate price for use of said land to be called 'ground rent' whether any phosphate or other mineral should be mined or not, reserving the privilege of terminating said contract upon expiration of ninety (90) days' notice in writing.

11.   That the defendant in and by lease sued on herein agreed to pay a specific rent for said land, whether any phosphate should be mined or not, reserving the privilege of terminating said lease upon expiration of ninety (90) days' notice in writing."

The trial court sustained the demurrer to all the pleas, and, the defendant declining to plead further, the following final judgment was rendered in favor of the plaintiffs:

"And now come the plaintiffs and move the court for judgment final on the amended third count to plaintiffs' amended declaration heretofore filed herein by leave of court first had and obtained; and plaintiffs' demurrer to defendant's several pleas to said amended third count, having been sustained and defendant having failed and refused to plead over; and the original contract and lease dated June 11th, 1907, the written instrument sued on herein, having been produced and filed in evidence before this court.

It is, therefore, considered by the court that the plaintiffs, Herbert W. Savage and Thomas P. Denham, do have and recover of and from the defndant, Roderick G. Ross, the sum of Twenty-Two Hundred and Fifty and no-100 Dollars ($2250.00) as damages, and the further sum of Three and 44-100 Dollars ($3.44) as and for their costs in this behalf expended and herein taxed at such sum.

Wherefore, let execution issue."

This judgment the defendant has brought here for review by writ of error, assigning the following errors:

"1.   The court erred in its order and judgment sus-

taining plaintiffs' demurrer to the defendant's pleas to the third count of the plaintiffs' amended declaration as amended, the same being the sixth, seventh, eighth and ninth pleas of the defendant; on the ground that one or more of the said pleas stated a good defense to the said count.

2. The Court erred in sustaining the plaintiffs' demurrer to defendant's plea numbered 6 because the said plea stated a good defense.

3. The Court erred in sustaining the plaintiffs' demurrer to defendant's plea numbered 7, because the said plea stated a good defense.

4. The Court erred in sustaining plaintiffs' demurrer to defendant's plea numbered 8, because the said plea stated a good defense.

5. The Court erred in sustaining plaintiffs' demurrer to defendant's plea numbered 9, because the said plea stated a good defense.

6. The Court erred in rendering final judgment for the plaintiffs.

Wherefore said defendant prays that the said several rulings and judgments may be reversed."

As will be seen by reference to the opinion rendered upon the former writ of error, this "amended third count to the amended declaration," which we have copied in full above, is based upon the same lease or contract which was attached as an exhibit to the original declaration and by apt words made a part thereof. In the count of the declaration now before us such instrument is bodily incorporated. We see no difference, so far as the legal effect is concerned, between bodily incorporating an instrument in the declaration and attaching the same as an exhibit to the declaration and making it a part thereof by apt words. The original declaration contained two

counts, "The first in substance," as stated in the former opinion, "declaring upon a lease for rent alleged to be due under the terms and conditions of an instrument under seal called a lease, and the second as upon a breach of covenant contained in said instrument." To the orig-inal declaration the defendant filed three pleas, the first of which was "that the alleged indenture is not his deed," upon which first plea the plaintiffs joined issue. The other two pleas were in substance and legal effect the pleas filed in the instant case, to which two pleas a de-murrer was interposed and sustained, as is also true of the instant case. In the former case the parties pro-ceeded to trial upon the issue so joined, when the plain-tiffs offered in evidence the lease upon which the action was based, to the introduction of which the defendant interposed objections upon certain named grounds, which were sustained, whereupon the plaintiffs took a non-suit and suffered a final judgment to be entered against them, which they brought here for review by writ of error, which judgment, as we have said above, we reversed. We have deemed it advisable to make this reference to our former opinion for the reason that, as we have repeat-edly held, all the points adjudicated by an appellate court upon a writ of error or an appeal become the law of the case, and are no longer open for discussion or considera-tion. See McKinnon v. Johnson, 57 Fla. 120, 48 South. Rep. 910; A. R. Harper Piano Co. v. Seaboard Air Line Ry., 65 Fla. 490, 62 South. Rep. 482; First National Bank of St. Petersburg v. Ulmer, decided here at the present term. We must be careful, then, to bear in mind just what points were determined upon the former writ of error. A reference to the former transcript discloses that there was only one assignment of error, which was to the effect that the court erred in refusing to admit in

evidence the lease offered by the plaintiffs and which formed the basis of their action. This was the sole point which we were called upon to determine. We expressed no opinion as to the correctness of the ruling in sustaining the demurrer interposed to the second and third pleas. See McKinnon v. Johnson, *supra,* and Hillsborough Grocery Co. v. Leman, 62 Fla. 208 South. Rep. 684, wherein we held that the principle of the law of the case has no applicability to and is not decisive of points presented upon a second writ of error that were not presented upon the former writ of error and consequently were not before the appellate court for adjudication. In the opinion rendered upon the former writ of error we declined to construe the lease or to express any opinion as to whether or not the defendant was correct in his contentions, upon the ground that it was not proper for us to do so. We are called upon now to determine whether or not the pleas state a good defense to this "Amended third count to the amended declaration." In order to do this we must necessarily construe the lease. As is said by the defendant in his brief: "The defense may be concisely stated. It is simply that the rock undertaken to be mined had no actual existence. No point was made upon the form of the pleas and the case presents but one question, namely: whether there can be any recovery upon the contract sued on if it be admitted that the phosphate rock forming the subject matter of the contract had no actual existence." The plaintiffs concede the correctness of this statement, admitting that "the non-existence of minable rock" constitutes "the sum and substance of the pleas to the declaration." As we held in Hull v. Burr, 58 Fla. 432, 50 South. Rep. 754: "In construing any written instrument, whether a deed of conveyance, a bill of sale, mortgage, contract or what not,

the entire instrument must be considered in order to gather the real intent and to determine the true design of the makers thereof. To that end, all the different provisions of such instrument must be looked to and all construed so as to give effect to each and every of them, if that can reasonably be done. If clauses therein seem to be repugnant to each other, they must be given such an interpretation and construction as to reconcile them if possible, remembering that the intent is the principal thing to be regarded. If one interpretation, looking to the other provisions of the instrument and its general scope, would lead to an absurd conclusion, such interpretation must be abandoned and one adopted which will be more in accord with reason and probability." The correctness of this principle is frankly conceded by each of the parties litigant. As we said in Perry v. Woodberry, 26 Fla. 84, text 90, 7 South. Rep. 483, text 485, which language we quoted with approval in Knight, Norman & Co. v. J. C. Turner C. L. Co., 55 Fla. 690, text 700, 45 South. Rep. 1016, text 1019: "When parties deliberately put their engagements in writing in such terms as impart a legal obligation without any uncertainty as to the object or extent of the engagement, it is, as between them, conclusively presumed that the whole engagement and the extent and manner of the undertaking is contained in the writing. * * * No other language is admissible to show what they meant or intended, and for the simple reason that each of them has made that to be found in the instrument the agreed test of his meaning and intention." As we also said in Pensacola Gas Co. v. Lotze, 23 Fla. 368, text 378, 2 South. Rep. 609, text 611, "the first point in construing a contract is to ascertain what was the meaning and understanding of the parties, as shown by the language used, applied to the subject-matter." We also

held in Langley v. Owens, 52 Fla. 302, 42 South. Rep. 457, 11 Ann. Cas. 247, "When words or terms having a definite legal meaning and effect are knowingly used in a written instrument, the parties thereto will be presumed to have intended such words or terms to have their proper legal meaning and effect, at least in the absence of any contrary intention appearing in the instrument." It is elementary that there must be a meeting of two minds in one and the same intention in order that there may be a contract.  Etheredge v. Barkley, 25 Fla. 814, 6 South Rep. 861; Knight, Norman & Co. v. J. C. Turner Cypress Lumber Co., 55 Fla. 690, text 699, 45 South. Rep. 1016, text 1019; Strong & Trowbridge Co. v. H. Baars & Co., 60 Fla. 253, 54 South. Rep. 92.

It is obvious that the mutual intention of the parties executing the lease in question was to give to the lessee the mining rights set forth therein.  If any doubt existed as to what was the intention of the parties, it would be absolutely settled by the following language adopted and used by them in the lease, "it being expressly understood between the parties hereto that this lease is made for the sole purpose of granting to the lessee the rights and privileges of exploring for mining, taking out and shipping therefrom the merchantable phosphate rock, as well as all other minerals of whatsoever kind or nature as hereinafter provided for, which is or may hereafter be found on, in or under the said land, with the right in the lessee to construct all buildings, and to make all excavations, openings, ditches and drains and construct all railroads, wagon-roads and all other improvements which are or may become necessary or suitable for the purpose of mining or removing therefrom phosphate or other mineral of whatever nature or kind found thereon and of the carrying on of mining operations thereon." This being

true, we are of the opinion that the case is ruled by Hiller v. Ray, 59 Fla. 285, 52 South. Rep. 623, 20 Ann. Cas. 1162, and Williams v. Phiel, 60 Fla. 272, 53 South. Rep. 638. We have read with interest the able brief filed by the counsel for the plaintiff, but fail to see how the instant case can be distinguished in principle from the two cited cases. As was said in Williams v. Phiel, *supra,* "While there is no express covenant on the part of the lessor that there was phosphate rock on the leased lands, yet it is plain that the parties to the contract assumed that there was phosphate sufficient to enable the lessees to comply with the terms of the contract. There is nothing to show the contrary." But for this mutual assumption the contract would have never been made. We are of the opinion that the covenant to pay advance royalties or ground rent is not an independent covenant, but must be held to be dependent upon the covenant to pay "royalty on all phosphate rock mined and shipped from said lands under this lease, while the same shall remain in force at the rate of fifty cents (50c) for each gross ton." As was said, in passing upon a clause of like character in Hiller v. Ray, *supra:* "The alternative obligation to pay 'five thousand dollars per year * * * whether the mining is carried on or not,' is based upon the assumption that rock of the specified 'quantity and quality (was) contained in said lands. The contingency sought to be guarded against was the failure to mine, not the failure to find the rock to mine, for the contract assumed and contemplated the existence of the rock as its subject-matter."

We think that the pleas set up a good defense to the declaration, therefore the court erred in sustaining the demurrer to the pleas.

The judgment must be reversed.

TAYLOR, COCKRELL AND HOCKER, J. J., concur;

WHITFIELD, J., disqualified.